## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2023-KA-00331-COA

TERRANCE ALEXANDER A/K/A TERRANCE               APPELLANT
LAMONT ALEXANDER

v.

STATE OF MISSISSIPPI                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 02/16/2023 |
| TRIAL JUDGE: | HON. MICHAEL M. TAYLOR |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOHN R. REEVES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | DEE BATES |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/07/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**EMFINGER, J., FOR THE COURT:**

### PART ONE

¶1.     On October 21, 2021, Terrance Alexander was indicted for three counts of sexual battery (Counts One, Two, and Three), six counts of exploitation of a child (Counts Four, Five, Six, Seven, Eight, and Nine), and one count of possession of child pornography (Count Ten).  Prior to trial, the court severed Counts One, Two, Three, and Ten.  After a two-day trial, Alexander was found guilty of each of the six counts of child exploitation on February 16, 2023.  Alexander was sentenced to serve forty years for each count of child exploitation, with each count set to run consecutively, for a total of 240 years in the custody of the

Mississippi Department of Corrections (MDOC). Aggrieved by the outcome of the trial, Alexander appealed after the trial court denied his post-trial "Motion for JNOV or Alternatively, Motion for New Trial."

**FACTS AND PROCEDURAL HISTORY**

¶2. In 2009, Alexander opened a performing arts school called the Jubilee Performing Arts Center (JPAC) in Pike County, Mississippi, where he served as a teacher and the executive director. The school was in operation between 2009 and 2020. JPAC had multiple locations in both Summit, Mississippi, and Brookhaven, Mississippi, during that time. Alexander testified that JPAC's mission was to "revive awareness of the fine arts in the community for the students" and "transform McComb back into the arts hub that it once was." Alexander also asserted that the school sought to prepare the students to be competent and competitive at the next level—whether that be in their careers, college, internships, or the professional arena. Several years after many of the JPAC students had graduated and become adults, allegations arose that Alexander had sexually exploited some of the students who had once attended JPAC. As a result, an investigation into those allegations and Alexander's involvement ensued.

¶3. The allegations against Alexander first arose when Latoya Ross[1] reported that her husband, Matthew Jackson,[2] had been instructed during his childhood to perform sexual acts

---

[1] Due to the nature of this case, pseudonyms will be used to protect the privacy of the victims named in the indictment.

[2] Jackson is not included in Alexander's indictment; however, his allegations assisted investigators in identifying the individuals listed in the indictment.

with another child while he attended JPAC. Further, she reported that Alexander and another teacher watched the two children engage in the activity. Ross made this report to McComb Police Department Investigator John Glapion in December 2020. After receiving the information from Ross, Glapion interviewed Jackson. Glapion found that Jackson's statements in that interview were consistent with Ross' initial report. His interview with Jackson also revealed the identities of other alleged victims of sexual abuse by Alexander.

¶4. At Glapion's request, Alexander voluntarily went to the police department, and a formal interview was conducted regarding Jackson's allegations. Glapion testified at trial that Alexander "admitted certain things regarding [Matthew Jackson]" in his interview. According to Glapion,

> I asked Terrance w[ere] there any other kids. Terrance replied there was other kids. I asked Terrance to give me some names. He asked me what names did I have. I told him that I would not give him those names. Terrance told me that there was a [Kenneth Brown], a [Knox Cross[3]] and a Bradshaw kid who was 16 years old at the time who was his student, that he had let them have sex at his house and at school while he stood in the doorway and watched.

Glapion also testified that Alexander admitted in his interview that

> he would coach [the students]. He would actually stop them at some point, tell them, "If you're going to do it, do it big." He would tell them, "If you're going to use toys, use toys if you have them." He would even go in and start rubbing on the kids and say, "Kiss him like this," or "Touch him like this."

According to Glapion, Alexander stated during his interview that

> He would have the male subjects that would sing and perform piano to shave all their body hair off their bodies, including their private areas . . . . He would

---

[3] Glapion referred to some of the students in his testimony by slightly different names; however, it is clear from the record that Glapion was referring to Kenneth Brown and Knox Cross. Both Brown and Cross testified at Alexander's trial.

3

have them come to him nude while he inspect[ed] them . . . . According to Glapion, Alexander stated that these activities took place both in his home and at the school.

¶5.     After his interview with Alexander, Glapion interviewed Knox Cross, a former JPAC student who was identified during the interview. Glapion testified that Cross' statement was consistent with Jackson's statement. In Cross' interview, he identified several other former JPAC students as victims of Alexander's abuse, including Nelson Mason, Melissa Jacobs, and Peter Anthony.[4] Other alleged victims were identified; however, some chose not to participate in the investigation. After Glapion's interviews with Mason, Jacobs, and Anthony, a ten-count indictment was filed on October 21, 2021. Alexander's trial took place on February 15-16, 2023.

¶6.     After Glapion, Jonathan Davidson was the second witness to testify for the State during Alexander's trial. While Davidson was not Alexander's biological son, Alexander took Davidson into his home when Davidson was fourteen years old and raised him as his own child. Davidson testified, "I was a troublesome child, so I was kicked out of a lot of schools, and JPAC was my last option." Davidson testified that when he got into high school, "things changed" at home and school. According to Davidson, Alexander taught him how to masturbate and made him watch pornography. Davidson testified that Alexander told him that masturbating would help him to refrain from having sex with women and keep his sin from God. Davidson testified that he and other students were required to attend "acting

_____

[4] All three of these students are listed in Alexander's indictment.

4

lessons" with Alexander at both the school and at Alexander's home as part of the JPAC curriculum. According to Davidson, at first, the acting lessons were just that, but later they evolved into sexual encounters among the JPAC students. Davidson testified that the lessons "became more so than the acting lesson [and evolved] towards sexual things that me and my friends would have to do." Davidson described instances where he and other students would have to undress in front of Alexander and touch each other in a sexual way. Davidson also testified that on one occasion, Alexander called upon Davidson to go into a room to make another student "know that he was gay" by acting out a scene of two gay men. Davidson identified Peter Anthony as one of the other students involved in the acting lessons that evolved into explicit sexual encounters between multiple JPAC students. Davidson testified that he was around fifteen or sixteen years old when these encounters occurred.

¶7. According to Davidson, Alexander also incorporated religion into the JPAC curriculum. Davidson testified that Alexander claimed to be able to hear the students' prayers, and he segregated them into groups by biblical references. Davidson testified that those groups included the prophets and the Levites, and their group affiliation dictated the students' status and responsibilities within the school. According to Davidson, it was not until he attended real acting classes at the University of Southern Mississippi and later when he got married that he realized how abnormal and "wrong" things were at JPAC under Alexander's leadership.

¶8. Melissa Jacobs, one of the victims named in Count Eight, was the third witness to testify for the State. Jacobs testified that she attended JPAC between 2011 and 2015 and

5

graduated in the spring of 2015. Jacobs testified that Alexander would always conduct a morning meeting during the time that she attended JPAC. During those meetings, Jacobs testified that Alexander would make the girls regularly stand up, and he would comment on their clothing, makeup, or how their hair was styled. Jacobs testified that the constant "picking" at her and the other girls ultimately broke her down. Jacobs testified that, in contrast, Alexander loved the boys. According to Jacobs, Alexander "always kept the boys close to him." Jacobs testified that Alexander was especially close to Nelson Mason (her brother), Jonathan Davidson, Peter Anthony, Kenneth Brown, Knox Cross, Daniel Boyd, and another student named Derrick. Jacobs testified to a specific incident that took place on a charter bus coming home from a school-sponsored spring break trip to New York during March 2014. Jacobs was sixteen years old at the time of the trip. According to Alexander, sixty-two JPAC students and twenty-seven chaperones went on the trip to New York. On the trip, the students performed at a school in Harlem and also visited the monuments and other sights in Washington, D.C. According to Jacobs, she was sitting in the front of the bus on the way back to JPAC when she got a text from Anthony asking her to come sit by him in the back of the bus. Jacobs testified that Alexander was sitting one seat beside and behind Anthony. When Jacobs got to the back of the bus, Anthony asked Jacobs for a "hand job." Jacobs testified that after Anthony made his request, Alexander told her, "You have one hour to do what you're going to do, and then I need you to go sit back in the front of the bus." Jacobs testified, "So I did, and I went and sat back down."

¶9.    Peter Anthony, the victim named in Counts Five, Six, Seven, and Eight, was the fourth

6

witness to testify for the State. Anthony testified that he began taking guitar lessons at JPAC when he was in seventh grade in 2012. According to Anthony, in the beginning, he had a typical student/teacher relationship with Alexander. Over time, however, Anthony testified that the relationship began to change. According to Anthony,

> [t]hrough time [Alexander] got closer and would spend more time talking to me in private and asking personal things about my life and claiming that he could see things in my past and in my future, and eventually it got to the point where he told me that he was my spiritual father, and that I didn't truly belong with my family, and he told me that my family didn't care for me or love me . . . and would say things like he has spiritual powers from God to do things like change the weather and slow and speed up time. . . . [H]e would talk about how all the students in the school were assigned groups or houses quoting Biblical references of – Levites were those who were supposed to be the musicians and take care of the music, Porters were ones supposed to clean up and tidy things, and then the Prophets, which he claimed I was, [were] the ones that were supposed to share the word of God, and he used that ideology to separate us into groups. And specific teachers had specific affiliations. As he was the Prophet, he was supposed to be the mentor for all the Prophets which gave him more time and exclusion with us, and me in particular.

Anthony testified that Alexander convinced him that Anthony's older brother had raped him and that the only way for Anthony to avoid being homosexual in the future was to have sex with other boys. According to Anthony, Alexander would

> arrange for us to go into classrooms, and he would close the door and turn off lights and go from looking at the window and looking at us and would demand that we do various sexual activities on each other . . . and he would even interject at times and reposition our bodies and move us to different places and recommend different things.

Anthony identified other former JPAC students who were involved in the sexual encounters that he described for the court. More specifically, Anthony identified David Edmonds, Kenneth Brown, Jonathan Davidson, and Knox Cross. Anthony testified that he never

7

wanted to take part in the sexual activities; however, he participated out of fear and confusion.

¶10.    Anthony also testified regarding several trips that he took with JPAC while he was a student at the school. The first trip that he testified about was the school-sponsored spring break trip to New York in March 2014. According to Anthony, he was sixteen at the time of the trip. Anthony's testimony mirrored that of Jacobs' testimony regarding an event that took place on the return bus trip to Mississippi. Anthony testified that Alexander asked him to text Jacobs to come sit with him in the back of the bus and then requested that she give him a "hand job." According to Anthony, Jacobs did what was asked of her while Alexander sat in a seat on the bus behind them where he was able to see the sexual encounter. The next trip that Anthony discussed was a trip to St. Louis in November 2014. During the St. Louis trip, Anthony testified that he and Alexander stayed in the same hotel room and also shared a bed. Anthony stated that Johnson and Davidson were also staying in the same hotel room and sleeping in the second bed. According to Anthony, after everyone else was asleep, Alexander made sexual advances toward him by inappropriately touching his body and trying to remove his clothes. Anthony testified that Alexander told him that he had one last chance to do what Alexander asked of him or he would not teach Anthony anymore. Anthony stated that after allowing him to "have his way" with him for a few minutes, he pushed him away and told him he didn't care if he couldn't "act" anymore. After returning from the St. Louis trip, Anthony did not receive any further "acting lessons" from Alexander. According to Anthony, he graduated from JPAC in June 2015, and all the events described for the court

8

happened before he graduated and while he was a JPAC student.

¶11. Kenneth Brown was the fifth witness to testify for the State. Brown testified that he became a student at JPAC in January 2013 during his second semester of tenth grade. Brown testified that shortly after he arrived at the school, Alexander told him to write down his biggest secret on a piece of paper and give it to him. According to Brown, the secret that he wrote down was that he had been molested as a young child. Brown testified that he had discussed his "secret" with Alexander and later told Alexander that he thought he (Brown) was interested in men. Brown stated that Alexander then began to initiate sexual encounters between Brown and Knox Cross. Brown testified that he and Cross would participate in sexual activity in different rooms in the school while Alexander watched and that these encounters happened "too many times to count." According to Brown, as things progressed, Alexander also initiated several sexual encounters between Brown and Anthony. Brown testified that if he ever declined to take part in the sexual activity that Alexander requested, he would be reprimanded. Brown confirmed Anthony's testimony about the students' religious group affiliations and the proposition that Alexander claimed to be the students' spiritual leader. Brown testified:

> [W]e're being told to, like, just, like, pray about things, and as kids, like, we're feeling like some of these things may be wrong, but we're putting all of our trust into Terrance. And we get to a point we want to pray for some sort of clarity, but we're scared to pray for that sense of clarity because we're like maybe he's going to hear it, and maybe we're going to get in trouble for him hearing that we wished something different than what he desires. . . . It comes from the – back to the coalition things, to him being a prophet and basically breaking that down to us saying how he can hear – like he can hear what we think, he could hear our prayers, and he can feel what we feel, so on and so forth.

9

Brown graduated from JPAC in 2015.

¶12. Nelson Mason, the victim named in Count Nine, was the sixth witness to testify for the State. Mason met Alexander during the summer of 2011 when he interviewed to become a JPAC student. Mason testified to a specific instance in August 2013 when Alexander called Mason and Brown into a bathroom on the third floor of the school and had both boys take off their pants and showed them how to clean their private areas. Mason testified, "I was instructed not to discuss certain things to my parents, certain conversations that we have had . . . . Eventually . . . I didn't have a relationship with my parents at all . . . because [of] Terrance. I looked at him like he was my dad at that point." While Mason stated that he was not gay, he testified that he felt like he had to tell Alexander that he was gay to feel accepted by him. Mason also testified that he was forced to participate in the "acting classes" with other male students, which turned into sexual encounters that made him extremely uncomfortable. As part of an acting class, Mason testified that on one occasion, Alexander told him to strip down until he was naked and parade in front of him in a runway-type walk. According to Mason, Alexander told him that he should be a model and that the runway walk exercise was part of that training. Shortly after that event, Mason's mom removed him from the school in 2015.

¶13. Knox Cross, the victim named in Count Four, was the last witness to testify for the State. Cross testified that he enrolled as a student at JPAC when he was in the seventh grade and attended until he graduated from high school. According to Cross, because he lived some distance from McComb, he would frequently spend the night at Alexander's home.

Cross' testimony was similar to the other witnesses' testimony in that his initial experience with the school seemed normal; however, things changed over time. Cross testified that when he was in the eighth grade, Alexander accused Cross of being a sex addict. By this time, Cross had been staying in Alexander's home and considered Alexander to be a second father figure. Cross testified that he cared for Alexander and valued his opinion, though he could not understand how he could be a sex addict when he had never had sex. When Cross denied the addiction, Alexander told him that he was prideful and that his pridefulness would lead to destruction. Further, Alexander told Cross that he would not have a future if he remained prideful and did not listen to Alexander. Similar to the testimony of the other alleged victims, Cross testified that the JPAC students could not be around certain students whom they would have liked at the school. According to Cross,

> [c]ertain groups couldn't talk to certain people if they wanted to. You had the Prophets and the Levites and the Evangelists and the Judges and the Porters and all of these different groups of people . . . children, that is . . . not having the freedom to talk to each other when they wanted to or making us date. We couldn't date who we wanted to date, we couldn't be around people that we wanted to be around. . . . It was very divisive.

Cross testified that Alexander continuously discussed his sexuality with him. Alexander told Cross, "This is who you are, and I'll give you a safe space to explore your sexuality because you can't come out to your parents." According to Cross, he didn't feel like he had the option to say no. Cross testified that Alexander then required him to use his cell phone to send him naked cell phone pictures of himself under the guise that Cross needed to learn to love himself. Cross testified that throughout the rest of his time at JPAC (until he graduated), he was required to take part in sexual encounters with other male students, including Kenneth

11

Brown, David Edmonds, Peter Anthony, Daniel Boyd, and Nelson Mason. Cross testified that on one occasion, he and Alexander drove to a hotel "across town," and Edmonds was waiting in a room there. Cross was required to have sex with Edmonds while Alexander sat in the room and watched. According to Cross, sex at the school became an everyday norm. Cross further testified that Alexander claimed to be "fixing" Cross' sexuality.

¶14.    Alexander testified on his own behalf and was the only witness called by the defense. Alexander denied all allegations of inappropriate or sexual behavior with any of the former JPAC students. In fact, Alexander testified that "[Jonathan] lied a lot," and Jacobs "had to be put on probation twice because she was engaging in sexual behavior with other students." Further, Alexander testified that Mason "was a torment to some of the teachers." According to Alexander, the trip to St. Louis that Anthony testified about was not a school-sponsored trip but, rather, a prestigious opportunity that arose for Alexander to have one of his songs presented to an audience of thousands of people. Alexander testified that the New York trip was a school-sponsored trip, and he denied any sexual or inappropriate behavior on either the St. Louis or New York trip. Finally, when questioned about admissions that he made in his interview with investigator Glapion, Alexander testified, "I had not taken my medication for over four hours. I suffer from massive depression and generalized anxiety disorder, so when I have an anxiety attack my brain becomes very foggy. . . . I was in extreme duress in anxiety attacks."

¶15.    After a two-day trial, Alexander was found guilty of all six counts of child exploitation. Aggrieved by the jury verdict, Alexander appealed, and the case was assigned

12

to this Court.

## ANALYSIS

¶16.    Alexander alleges six assignments of error on appeal.  Part One will address the following issues: (1) did the trial court err in denying Alexander's pretrial motions; (2) did the trial court err in overruling the defense's objections during the course of the trial; and (3) did the trial court err in denying Alexander's motion for a mistrial.  Part Two will address the remaining issues: (4) did the trial court err in failing to grant Alexander's motion for a directed verdict and denying his JNOV motion because the State failed to prove Alexander guilty beyond a reasonable doubt; (5) was the verdict of the jury against the overwhelming weight of the evidence; and (6) did Alexander receive a grossly disproportionate sentence?

### I.        The trial court did not err in denying Alexander's pretrial motions.

#### A.        Motion to Sever Counts

¶17.    On February 5, 2023, Alexander filed a "Motion to Sever Counts." The circuit court agreed to sever counts One, Two, Three, and Ten; however, the remaining six counts of child exploitation were tried together.  Alexander argues on appeal that the remaining six counts of his indictment should have been severed as well to ensure that he received a fair trial for each offense.  This Court reviews the circuit court's ruling to deny severance under an abuse-of-discretion standard of review.  *Stribling v. State*, 81 So. 3d 1155, 1162 (¶30) (Miss. Ct. App. 2011).

¶18.    Alexander contends that his indictment did not meet the requirements set forth in Mississippi Code Annotated section 99-7-2 (Rev. 2015), which provides that an indictment

13

may contain two or more offenses only if the offenses are "based on the same act or transaction" or if the offenses are "based on two . . . or more acts or transactions connected together or constituting parts of a common scheme or plan." *Id*. § 99-7-2(1). Alexander alleges that due to the "broad time frames" listed in each count of his indictment and the different alleged victims named in each count, the separate counts cannot be considered connected to continue a common scheme or plan.

¶19.    Mississippi Code Annotated section 99-7-2 provides:

> Two (2) or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.

The burden rests with the State to make a prima facie showing that a multi-count indictment is proper under the statute. *Stribling*, 81 So. 3d at 1162 (¶30). In *Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991), the Mississippi Supreme Court established a three-prong test to establish the appropriateness of severance, specifically, reasoning:

> In making its determination regarding severance, the trial court should pay particular attention to whether the time period between the occurrences is insignificant, whether the evidence proving each count would be admissible to prove each of the counts, and whether the crimes are interwoven.

¶20.    While the time periods listed in Alexander's multi-count indictment spanned several years, the larger time frames listed in the indictment represented the years that each alleged victim was enrolled at JPAC. The smaller time frames spanned only a few days and represented specific school trips and alleged sexual encounters that occurred on those trips. According to the testimony at trial, the alleged exploitation that the students endured

occurred throughout their entire enrollment period at JPAC. Kenneth Brown testified that the sexual encounters that he experienced with Knox Cross were "too many to count." The approach that Alexander took in segregating the students into groups and then slowly indoctrinating them into a culture where sexual activity was encouraged and posed as normal "acting lessons" was consistent and corroborated by each student's testimony. While each student's time at the school varied, there were overlapping periods of time in each count of the indictment. Secondly, the alleged victims testified that they were encouraged to engage in sexual activity with each other. Therefore, while there was some indictment-specific testimony by each witness, parts of each witness' testimony could be used to prove multiple counts of the indictment. The testimony of all the victims was relevant to prove a common scheme or plan of abuse. In *Golden v. State*, 968 So. 2d 378, 383 (¶17) (Miss. 2007), the supreme court held that in trying multiple counts together, "there would be some evidence in common and some not." Finally, it is clear that the six counts of child exploitation were "interwoven" because they "involve too many similar factors[,] when viewed together, to be anything but clearly linked and part of the same common scheme or plan." *Richardson v. State*, 74 So. 3d 317, 327 (¶34) (Miss. 2011) (quoting *Rushing v. State*, 911 So. 2d 526, 536 (¶19) (Miss. 2005)). We find no error by the circuit court denying Alexander's motion to sever Counts Four through Nine.

### B. Motion in Limine to Exclude Other Bad Acts

¶21. On February 5, 2021, Alexander filed a motion to exclude prior bad acts. However, Alexander's pretrial motion did not identify with particularity which witnesses or what

15

testimony he was asking the court to exclude. Instead, Alexander's motion was generic in nature and claimed:

> It is unclear at this time, but the defense believes the State will attempt to introduce alleged prior bad acts of the defendant in this trial. Any mention of said acts would be irrelevant and far more prejudicial than probative, and in violation of Rule 403 and 404 of the Mississippi Rules of Criminal Procedure [sic].

After hearing counsel's argument on the motion, the circuit court ruled that it was not going to issue a "blanket ruling" on the motion but would take the objections up "on an item-by-item basis at the appointed time." Our standard of review is set forth in *Donaldson v. State*, 262 So. 3d 1135, 1161 (¶107) (Miss. Ct. App. 2018):

> We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Evans v. State*, 25 So. 3d 1054, 1057 (¶6) (Miss. 2010). "[A] motion in limine should be granted only if: (1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." *Id.* "Before granting a motion in limine, courts must be certain that such action will not unduly restrict opposing party's presentation of its case." *Whittley v. City of Meridian*, 530 So. 2d 1341, 1344 (Miss. 1988).

Without more, the trial court did not err by reserving a ruling on the motion until Alexander could direct the court's attention to specific testimony from a particular witness.

¶22. On appeal, Alexander limits his challenge to the testimony of Jackson and Brown. He argues that the probative value of Matthew Jackson's and Kenneth Brown's testimonies was "substantially outweighed by the danger of unfair prejudice." Alexander contends that their testimonies do not fall under any exceptions provided by Mississippi Rule of Evidence 404(b)(2).

16

¶23.    Matthew Jackson did not testify at trial. Investigator Glapion testified that Jackson's wife came to the McComb Police Department in December 2020 and reported that her husband had been abused by Alexander while he was a student at JPAC. She told Glapion that Alexander would have students perform sexual acts on each other while he watched them. There was no objection raised by Alexander during this portion of Glapion's testimony.

¶24.    The State asked Glapion, after speaking with Jackson's wife, what he did next in his investigation. Glapion responded, "I end up talking to her husband, [Matthew Jackson]. [Matthew] came in, he said he had," at which point Alexander's counsel raised an objection to hearsay. The trial court sustained his objection. The State rephrased the question to ask Glapion to explain how his investigation proceeded. Glapion testified that Jackson's statements were consistent with the report his wife had made and also indicated that other juveniles were involved.

¶25.    Glapion told the jury that he next contacted Alexander and asked him to come in for an interview.  Glapion told the jury that during this interview of Alexander, Alexander described discussions he had had with Jackson about Jackson's sexuality. Alexander's counsel objected as to relevance since Jackson was not listed as a victim in the indictment. The State was instructed by the trial court not to go into the details of Alexander's contact with Jackson because it was not part of the indictment. At that point, Glapion advised the jury that Alexander gave him the names of other students that he allowed to have sex at his house and at school while he watched.

¶26.    The court sustained the objections Alexander raised at trial over Glapion's testimony

concerning statements Jackson made. In any event, Glapion's testimony concerning his interview with Jackson and Alexander's statements concerning his contact with Jackson were admissible to show the information that Glapion relied upon to further his investigation. In *Stevens v. State*, 312 So. 3d 1205, 1209 (¶9) (Miss. Ct. App. 2021), this Court stated:

> An out-of-court statement is hearsay if it is offered "to prove the truth of the matter asserted." M.R.E. 801(c). Thus, to determine whether a statement is hearsay we must first determine the purpose for which it was offered and admitted. *Smith v. State*, 258 So. 3d 292, 309 (¶50) (Miss. Ct. App. 2018). Our Supreme Court and this Court have held repeatedly that out-of-court "[s]tatements do not constitute hearsay when admitted" not to prove the truth of the matter asserted but rather "to explain an officer's course of investigation or motivation for the next investigatory step by that officer." *Eubanks v. State*, 291 So. 3d 309, 322-23 (¶51) (Miss. 2020) (emphasis added) (quoting *Smith*, 258 So. 3d at 309 (¶52) (quoting *Fullilove v. State*, 101 So. 3d 669, 675 (¶20) (Miss. Ct. App. 2012))).

We find no error by the trial court concerning its rulings on the motion in limine and the objections raised by Alexander at trial relative to Matthew Jackson.

¶27. Unlike Jackson, Brown did testify at trial. When Brown was called to testify by the State, the defense asked to approach the bench and advised the trial court:

> Your Honor, this is [Kenneth Brown]. He's not a person in the indictment. I understand the case law, but this is nothing more than a prior bad act. It's – and that's what I expect him to testify to.

The State responded:

> He's going to testify – I think everything he will testify to is eyewitness accounts to the other parts of the indictment. I mean, he was a participant in [Knox's], [Anthony's,] and [Nelson's] [incidents].

The trial court instructed the State to limit its questioning of Brown to "the things in the indictment." At that point, defense counsel thanked the court for its ruling.

¶28.    Alexander raised no further objection until the State asked Brown how he came to speak with Glapion.  Brown responded that he decided to "step up" after he saw things on the news and Facebook. The defense raised a non-specific objection that the trial court overruled, and the court instructed the State to "move on."  Brown testified to events he witnessed or participated in with the victims in various counts of the indictment. Later in the State's direct examination of Brown, the State asked Brown, "Okay. And [David Edmonds], who is that?" Brown began to answer by saying that he was a relative of Alexander's, "and he would every morning he would have me, easily for a month, would have me."  At that point the defense raised an objection and approached the bench. During the bench conference, the State advised the court that Brown was going to testify about having sex with "[Edmonds]." The defense argued that Edmonds was not mentioned in the indictment. The trial court sustained the objection, and Brown was not asked any further questions about Edmonds' sexual conduct.

¶29.    Alexander's counsel was content with the trial court's ruling that Brown's testimony should be limited to eyewitness accounts of sexual conduct relating to victims named in the indictment. Defense counsel advised the court, "I understand the case law," and asked for nothing more from the trial court.  Accordingly, the State offered Brown's testimony to prove the indicted acts.  When the State strayed from those named in the indictment, the trial court sustained the defense's objections and required the State to honor its ruling to limit Brown's testimony to his knowledge of sexual acts involving victims named in the indictment. We find that the trial court did not err in its ruling on the motion in limine and Alexander's

19

subsequent objections.

**II.    The trial court did not err in overruling Alexander's objections during the course of the trial.**

¶30.    Alexander argues that the trial court erred in overruling his counsel's objections throughout the trial.  In his brief, Alexander points to fourteen instances where the court overruled his objections, allegedly causing unfair prejudice, and we address each in turn.

¶31.    "The standard of review for evidentiary rulings is abuse of discretion." *Cook v. State*, 161 So. 3d 1057, 1065 (¶21) (Miss. 2015).  "And when a trial court abuses its discretion on evidentiary issues, we reverse only where a substantial right of a party is affected." *Young v. State*, 106 So. 3d 775, 777 (¶9) (Miss. 2012) (internal quotation mark omitted).

**A.    Objection to the State's Opening Statement**

¶32.    The purpose of the State's opening statement was to advise the jury of the facts the State expected to prove at trial. *See* MRCrP 19.1(a)(2); *Jones v. State*, 390 So. 3d 498, 502 (¶15) (Miss. 2024). As Alexander notes in his brief, in *Sheppard v. State*, 777 So. 2d 659, 661 (¶7) (Miss. 2000), the supreme court held:

> The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created. *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992).

Alexander claims that some of the incidents the State described in its opening statement pertaining to the expected testimony of Nelson Mason were not relevant because only one count in the indictment named Mason.  Alexander contends that the references to multiple incidents were not relevant to that one count, and he contends the court erred by overruling

20

the objection made during the State's opening statement.

¶33. The State argues that all the incidents referenced in its opening statement concerning Mason took place in the time frame described in Count Nine of the indictment, and they, were therefore relevant to prove that count. In *Caldwell v. State*, 6 So. 3d 1076, 1078 (¶6) (Miss. 2009), the supreme court reasoned that pursuant to Mississippi Rule of Evidence 404(b):

> This Court has repeatedly held that "evidence of prior sexual acts between the accused and the victim is admissible to show the accused's lustful, lascivious disposition toward the particular victim, especially in circumstances where the victim is under the age of consent." *Walker v. State*, 878 So. 2d 913, 915 (Miss. 2004) (citations omitted).

¶34. Alexander argues for the first time on appeal that because the State's opening statement concerning Mason's expected testimony "caused confusion of the issues by the jury and unfair prejudice to Alexander," his objection during the opening statement should have been sustained and the evidence itself should have been excluded pursuant to Mississippi Rule of Evidence 403. However, Alexander never requested that the trial court balance such evidence pursuant to Rule 403. Accordingly, this argument is barred on appeal. *See Thames v. State*, 310 So. 3d 1163, 1170 (¶35) (Miss. 2021). In any event, the trial court did not err by overruling Alexander's objection during opening statements.

**B. Hearsay Objection during Davidson's Direct Examination**

¶35. During his direct examination, Davidson stated, "I had a friend named [Anthony], and he would say something like, 'Hey, man'. . . ." At this point in Davidson's testimony, defense counsel raised a hearsay objection. While the objection was overruled, there was no

21

further testimony about Anthony or what Anthony said. In fact, the State directed Davidson, "Without going into what [Anthony] actually said to you, what would happen?" Davidson's direct examination continued with no other hearsay statements. This issue is without merit.

### C. First Relevance Objection during Davidson's Direct Examination

¶36. Also during direct examination, the State asked Davidson, "What sorts of things have you seen, that you recall, have you seen Kenneth [Brown] sexually engage in the presence of Terrance?" Davidson responded, "[O]ne day I was called down to . . . and to help push the force that [Kenneth] was gay. . . . I was called down to go in a room to make [Kenneth] know he was gay." In response to Davidson's statement, defense counsel raised a relevance objection. Alexander argued that because neither Davidson nor Brown were listed in his indictment, any further testimony would be irrelevant and unfairly prejudicial. The Court overruled part of the objection and stated that the testimony could be relevant to show purpose, motive, or plan.[5] The court did, however, sustain part of the objection ruling that Davidson's response was unresponsive to counsel's question. Alexander fails to argue with

---

[5] The trial court, in making its ruling, referred to the decision in *Saddler v. State*, 297 So. 3d 234, 240 (¶19) (Miss. 2020):

> Evidence of Saddler's prior acts was admissible. "[W]hen the sexual acts bear 'overwhelming similarities' to the conduct at issue, they are 'undeniably' admissible under Rule 404(b) as both motive and as evidence of a 'common plan, scheme, or system.'" *McGrath v. State*, 271 So. 3d 437, 441 (¶16) (Miss. 2019) (quoting *Green v. State*, 89 So. 3d 543, 550 [(¶17) & n.19](Miss. 2012)).

22

any specificity how Davidson's response was unfairly prejudicial.[6] Davidson's statement corroborated the testimony of other JPAC students as evidence of Alexander's scheme or plan to have the students participate in sexual activity with each other, sometimes in the presence of others. We find no abuse of discretion by the trial court.

### D. Second Relevance Objection during Davidson's Direct Examination

¶37. Davidson testified that Alexander claimed he had certain spiritual powers over the JPAC students, including being able to hear their prayers or forecast certain punishments or accidents for disobeying his instruction. Defense counsel objected to Davidson's testimony, claiming that it was irrelevant. The trial court overruled counsel's objection. The State argued that Davidson's testimony regarding Alexander's supernatural authority over the JPAC students was relevant to show the grooming scheme that Alexander implemented to manipulate and sexually exploit the students. This point was specifically evidenced in Brown's testimony at trial. Brown testified that even when he sensed that some of Alexander's requested behavior might have been wrong, he was scared to pray for clarity, not only for fear that Alexander could hear his prayers, but for fear of punishment if his desires were not the same as Alexander's. We find there was no abuse of discretion by the trial court.[7]

---

[6] Again, Alexander did not request the trial court to conduct a balancing test under Rule 403; therefore, this issue has been waived. *See also Pitchford v. State*, 45 So. 3d 216, 239 n.47 (Miss. 2010) (The supreme court stated that "a trial court will not be held in error on a matter not presented to it for decision.").

[7] While Alexander again makes an argument under Mississippi Rule of Evidence 403 on appeal, he waived that issue by failing to raise it in the trial court.

### E. "Asked and Answered" Objection during Davidson's Direct Examination

¶38. During direct examination, Davidson was asked, "I don't know if I've asked you this one. When if ever, did you see Terrance hard?" Defense counsel raised an objection and argued that the question had been asked and answered. The court overruled the objection and allowed Davidson to answer. Davidson said, "And I don't know if he had to pee or whatever, but yeah, he was hard. But I've never – like I said, never done anything with him or nothing like that." The transcript reflects that the State had previously asked Davidson whether he had ever witnessed Alexander in a "state of sexual arousal," and Davidson did not directly respond. The State followed up by asking whether Davidson had ever witnessed Alexander's penis erect. Davidson said that he had not. It can be argued that the questions asked by the State were each different, and there was no further testimony concerning the issue. Alexander failed to show how he was prejudiced or harmed or that the admission of Davidson's limited answers adversely affected a substantial right. Under our standard of review set forth above in *Cook* and *Young*, we find no reversible error.

### F. Objection to Introduction of a Photograph during Jacobs' Direct Examination

¶39. During Jacobs' direct examination, the State attempted to introduce a photograph of Jacobs and Anthony. Alexander's counsel raised an objection on the basis of relevancy, stating, "It's just a picture of these two in the same room. I just don't see how it's relevant, how it moves forward an element of any crime." The State argued that the photograph was being admitted to prove the students' ages at the time of the alleged exploitation. Being that

24

the State had the burden to prove that the JPAC students were children to prove that Alexander was guilty of child exploitation, we find no abuse of discretion by the trial court in admitting the photo into evidence through Jacobs' testimony.

### G. Objection during Anthony's Direct Examination Concerning "Ideologies"

¶40. During Anthony's direct examination, the State asked Anthony to "explain some of [Alexander's] ideologies regarding religion or his different classifications and things." Alexander's counsel raised an objection as to relevancy; however, counsel offered no further reasoning. The objection was overruled without any further explanation from either counsel or the trial court. On appeal, Alexander argues that pursuant to Mississippi Rule of Evidence 601, "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." In the case at hand, Alexander's religious beliefs were not being introduced to attack his credibility but, rather, to further the State's argument that Alexander's religious ideologies were a crucial aspect defining the plan and scheme to exploit the JPAC students. More specifically, Alexander's religious ideologies and his practice of segregating the students into groups with religion-inspired names was a central aspect of the grooming scheme, which he perpetuated throughout the time period listed in the indictment. By segregating the students into groups, Alexander was able to isolate students, control their social groups, and control the level of access he had to them. We find no abuse of discretion by the trial court in overruling Alexander's objection.[8]

---

[8] Again, Alexander's effort to claim error pursuant to a lack of a Rule 403 balancing test is barred on appeal.

25

### H. Objection to the Admission of Two Photographs during Anthony's Direct Examination

¶41. During Anthony's direct examination, the State sought to introduce two photographs. One photograph was of Anthony, Alexander, Jonathan Davidson, Elliot Johnson, and another child. The second photograph was of Anthony and Davidson. Alexander's counsel raised an objection to the photographs being entered into evidence. Counsel stated, "Your Honor, I would make a very similar objection as I did to S-1." The court noted but overruled the objection, and the photographs were admitted into evidence. As noted in the paragraph above, because the State had the burden to prove that the JPAC students were children to prove that Alexander was guilty of child exploitation, we find no abuse of discretion in the trial court's admission of the photos into evidence through Anthony's testimony.

### I. Objection to Kenneth Brown as a Witness

¶42. When the State called Kenneth Brown to testify, Alexander's counsel raised an objection to Brown's testimony claiming he would testify to nothing more than prior bad acts. Because Brown was not listed in Alexander's indictment, Alexander claimed that Brown should not be allowed to testify. Alexander claims on appeal that Brown's testimony was highly prejudicial and irrelevant, with no probative value. The State argued that Brown's testimony was proper because he would testify to first-hand knowledge and participation in certain acts substantiating multiple counts involving Mason, Cross, and Anthony. Alexander's counsel then stated, "[M]y fear was something personal that happened to him that – that he's not giving firsthand knowledge to about the other victims." Just as the trial court had ruled prior to trial on Alexander's motion in limine, the court instructed the

26

State to limit Brown's testimony to his knowledge of the charges contained in the indictment. Other objections Alexander raised during Brown's testimony were addressed above in the assignment of error dealing with the motion in limine. We find no abuse of discretion by the trial court's ruling on the objection to Brown's testimony.

### J. Objection to Admission of Two Photographs during Brown's Direct Examination

¶43. During Brown's direct examination, the State sought to introduce two more photographs into evidence. The pictures were taken while Brown was a student at JPAC and portrayed Brown and other students listed in Alexander's indictment. Alexander's counsel argued, "I would object as to the relevancy of these photos." Without further argument from either counsel, the court overruled the objection and allowed the photographs to be entered into evidence. The State argues on appeal that the photographs were relevant not only to show Brown's and the other students' ages, but also to show that Brown was friends with the students listed in the indictment, giving his testimony more credibility. For those reasons and the reasons mentioned in the prior paragraphs, we find no abuse of discretion in the trial court's ruling on the objection.

### K. "Asked and Answered" Objection during Knox Cross' Direct Examination

¶44. During direct examination, the State asked Cross, "Was there ever any conversations with Terrance about telling other people about these acting lessons or not telling other people about these acting lessons?" Cross responded to the question by discussing a conversation that Alexander had had with Cross' dad. Finding Cross' answer was not responsive to the

question he was being asked, the State rephrased its question as follows:

> Okay. I want to ask you about what, if anything, that you or the other guys were told around you about telling other students or teachers or your parents or your family, your relatives, your other friends that don't know about the acts that you engaged in. Was there ever any discussion about how you could or should refer to what happened at Terrance's in these private lessons or at the school in these private lessons?

Alexander's counsel objected, stating, "Your Honor. I'm going to say it's asked and answered. I think this is the third time." While the court overruled the objection, the State asked Cross if he understood the question that he was being asked, and Cross requested that the question be rephrased. In turn, the State asked, "Did Terrance ever have any discussions with you about whether or not you should tell other people?" Cross responded, "Oh, no, no no, not at all. It was very, 'keep this a secret because your father wouldn't approve of your lifestyle' . . . ." While the question seemed to be asked multiple times, it was done only to seek clarity in the response. We find no abuse of discretion in the trial court's ruling on the objection.

### L. Objection during Cross' Direct Examination to Questions Concerning whether Alexander had a Doctorate Degree

¶45. During direct examination, the State asked Cross whether he knew if Alexander actually had a "doctorate in anything." Alexander's counsel objected to relevance, and the objection was overruled by the trial court. Cross answered, "[T]o my knowledge, no." Cross then further testified that he learned during a visit by the accreditation committee that Alexander did not have a Ph.D. Alexander's counsel raised a hearsay objection which was sustained by the trial court. Since Alexander was a founder of the school and a teacher, his

28

level of education was relevant. Alexander failed to state with any specificity what, if any, prejudice he suffered by this testimony. We find no abuse of discretion in the trial court's ruling on the relevance objection.

## M. Objection in Cross' Redirect Examination

¶46. In the last question during Cross' cross-examination, Alexander's counsel questioned, "And you didn't report anything to law enforcement or any authorities until five or so years later, correct?" Cross responded, "Correct." The very first question that Cross was asked by the State during redirect examination was, "And why didn't you report it?" Cross responded:

> Because like any abusive relationship, you don't realize that you are . . . that it's happening until well after you've had time to process it. For example, I remember I was in college, and I . . . went to this artist meeting, all the people who were in my age group, and we were in there singing and being creative together, and . . . , someone got up to do poetry, and they talked about being sexually abused, and then . . . .

Alexander's counsel first objected to Cross' testimony on the basis that it was hearsay and non-responsive. The State argued that the answer was responsive. The trial court asked counsel to approach the bench and asked Alexander's counsel to state his objection again. Counsel then argued that it was hearsay, non-responsive, and outside the scope of his cross-examination. The trial court overruled the objection and explained, "[T]he issue put before the jury on cross was why the delay . . . and he's seeking to explain that, so I will allow it." Clearly, the State's question on redirect was asked to further explain when and why Cross came forward concerning his experience at JPAC and why it was not done sooner. Because Alexander's attorney opened the door during cross-examination regarding the timing of

Cross' disclosure of alleged abuse, the State's redirect examination was proper. Further, Cross did not testify regarding what was said during the poetry reading as proof of the truth of the matter asserted but, rather, to explain how he came to understand that what had happened to him at JPAC needed to be reported to the authorities. We find no abuse of discretion in the trial court's ruling on the objection.

### N. Objection during Alexander's Cross-Examination

¶47. During cross-examination, the State asked Alexander for the names of the fourteen chaperones who were on the JPAC trip to New York. It is noteworthy that the event that took place on the school trip to New York was included in Alexander's indictment. During that line of questioning, the State asked Alexander if one of the chaperones named Anthony Daniels was still in jail. Alexander's counsel objected and argued that any testimony regarding whether Daniels was in jail was irrelevant. The trial court initially overruled the objection with no further argument from counsel. The State continued its cross-examination and asked Alexander, "Did you know that he was in jail for involvement with a young girl?" Alexander's counsel reinstated his objection as to relevancy, and the objection was sustained at that point. On appeal, Alexander argues that the objection should have been sustained when the State first asked if Daniels was in jail. Alexander failed to argue with specificity any prejudice caused by initially overruling counsel's objection. In any event, once the objection was sustained, Alexander's counsel did not request that the trial court instruct the jury to disregard that series of questions and answers. In *Travis v. State*, 972 So. 2d 674, 683 (¶37) (Miss. Ct. App. 2007), this Court stated:

30

> Where a circuit court sustains an objection and a party does not ask the circuit court to instruct the jury to disregard the objectionable matter, there is no error. *Perry v. State*, 637 So. 2d 871, 874 (Miss. 1994). Said differently, when a defendant received the relief he requested, the defendant has no basis to complain on appeal. *Broomfield* [*v. State*], 878 So. 2d [207,] 221(¶57) [(Miss. Ct. App. 2004)].

Accordingly, this issue is without merit.

### III. The trial court did not err in denying Terrance Alexander's motion for a mistrial.

¶48. During Anthony's direct examination, the State asked him when he decided to stop communicating with Alexander. Anthony responded, "After I had heard allegations of another child . . . being sexually abused." After Anthony's response, Alexander's counsel, without ever using the word "objection," requested a bench conference outside the hearing of the jury. The State argued, "Obviously, I don't know which child he's talking about, but there was a number of them, and I stopped before he could get into the other." Alexander's counsel responded, "And I absolutely get it, but I think – I think that crossed it, you know. You know." The trial court asked the defense what he wanted the court to do. Defense counsel said, "Well, I'm going to request a mistrial. I understand, but I think what we have is we just delved into Counts 1, 2 and 3." The court ruled, "I will admonish the jury to disregard the remark." The Court also advised the attorneys that the motion for a mistrial was overruled. Immediately following the bench conference, the jury was instructed to disregard the last remark by the witness.

¶49. On appeal, Alexander argues that the statement "sexually abused" was an impermissible reference to the sexual battery charges in Counts One, Two, and Three, which

had been severed and were not at issue in this trial. According to Alexander's appellate counsel, such statement by the witness "caused confusion of the issues by the jury and substantially and irreparably prejudiced Alexander's case."

¶50.    In *Williams v. State*, 919 So. 2d 250, 253 (¶12) (Miss. Ct. App. 2005), this Court explained:

> We review the trial court's decision to grant, or deny, a mistrial under an abuse of discretion standard. *Horne v. State*, 487 So. 2d 213, 214 (Miss. 1986). A trial judge possesses the authority to declare a mistrial where prosecutorial conduct substantially deflects the attention of the jury from the issues that it has been called upon to decide or appeals to bias, passion, or prejudice, and, therefore, significantly impairs a defendant's right to a fair trial. *Hickson v. State*, 472 So. 2d 379, 384 (Miss. 1985). The trial judge is permitted considerable discretion in determining whether a mistrial is warranted since the judge is best positioned for measuring the prejudicial effect. *Id.* (citing *Roundtree v. State*, 568 So. 2d 1173, 1178 (Miss. 1990)).

Further, in *Groves v. State*, 360 So. 3d 1012, 1017 (¶14) (Miss. Ct. App. 2023), this Court explained that the trial judge is in the best position to not only determine what is prejudicial to a jury but also how to address those concerns. "Where 'serious and irreparable damage' has not resulted, the judge should 'admonish the jury then and there to disregard the impropriety.' The jury is presumed to have followed the admonition of the trial judge to disregard the remark." *Id.* (quoting *Wilson v. State*, 797 So. 2d 277, 282 (¶13) (Miss. Ct. App. 2001)).

¶51.    Anthony's brief response did not mention a specific child's name that would link his comment to the victims in Counts One, Two, or Three. Further, Alexander did not argue before the trial court that the use of the words "sexually abused" would be confusing to the jury; therefore, that argument is not properly before this Court. Because this argument was

not raised before the trial court, it is barred from appellate consideration. *See Douglas v. State*, 378 So. 3d 361, 372 (¶34) (Miss. 2024). In any event, we find no abuse of discretion in the trial court's ruling on Alexander's motion for a mistrial.

**McCARTY, J., FOR THE COURT:**

**PART TWO**

**IV.    There was sufficient evidence to support Alexander's conviction.**

¶52.    Alexander next argues the trial court should have granted his motion for a directed verdict, protesting that the evidence was insufficient to convict him on the individual counts contained in the indictment. Alexander raised the issue in his post-trial motion for judgment notwithstanding the verdict. On appeal, we now review his claims that his convictions should be reversed for insufficient evidence.

¶53.    "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). The issue is not "whether we think the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010).

¶54.    Additionally, Mississippi caselaw has established that "[a] motion for a JNOV in which the sufficiency of the evidence is challenged must be specific." *West v. State*, 378 So. 3d 422, 427-28 (¶14) (Miss. Ct. App. 2023) (quoting *Gary v. State*, 11 So. 3d 769, 771 (¶8) (Miss. Ct. App. 2009)). "[W]ithout specificity as to how the evidence was insufficient, the

33

trial court will not be determined to be in error for denying the motion." *Id*.; *see also Easterling v. State*, 306 So. 3d 808, 818 (¶23) (Miss. Ct. App. 2020) ("A motion for a directed verdict on the grounds that the State has failed to make out a prima facie case must state specifically wherein the State has failed to make out a prima facie case. Such specificity is also required in a motion for a JNOV. If not specifically argued before the trial court, it is waived because issues may not be raised for the first time on appeal." (citation omitted)).

¶55. At the close of the State's case-in-chief, Alexander's counsel made an ore tenus motion for a directed verdict as to all counts. Counsel argued, "we would simply show that the State has failed to make a prima facie showing of the necessary elements to prove [its] case, and we are requesting a directed verdict as to each of those counts." After a lengthy response from the State as to the proof for each count, the trial court ruled, "Again, taking all the evidence that the Court has heard in the light most favorable to the State, the directed verdict should be denied." And after his convictions, Alexander filed a motion for judgment notwithstanding the verdict. In his JNOV motion, Alexander argued that "[t]he Court erred in not granting a directed verdict at the conclusion of the State's case and the conclusion of the trial." Both Alexander's motion for a directed verdict and this post-trial motion failed to state with any specificity how the State failed to make a prima facie case in presenting the necessary elements to prove its case.

¶56. Accordingly, we find that Alexander clearly failed to state with any specificity in either his motion for a directed verdict or his post-trial motion how the State failed to make

34

out a prima facie case. As such, Alexander is procedurally barred from making an argument regarding the sufficiency of the evidence on appeal, and we decline to review the issue. *See Sheffield v. State*, 749 So. 2d 123, 126 (¶10) (Miss. 1999).

¶57. While this Court recognizes that Alexander's argument regarding the sufficiency of the evidence is procedurally barred, "this Court must be constantly aware of questions of [its] jurisdiction to proceed and must be prepared to decide a question pertaining to jurisdiction at any time, even if the court must raise the issue on its own motion." *Gallagher v. City of Waveland*, 182 So. 3d 471, 474 (¶13) (Miss. Ct. App. 2015) (quoting *McKee v. City of Starkville*, 97 So. 3d 97, 100-01 (¶¶10-11) (Miss. Ct. App. 2012)).

¶58. While neither party addressed the issue of jurisdiction regarding Counts Six, Seven, and Eight in their briefs, it was raised and discussed in oral argument. Specifically, the panel inquired of the State how there was jurisdiction if the events of Counts Six and Seven occurred partly in St. Louis and if Count Eight occurred partly in New York. When directly questioned by this Court's panel, the State argued that Mississippi Code Annotated section 99-11-17 (Rev. 2015) set jurisdiction in Pike County. The State maintained that Alexander founded the school, organized the trips, and determined who would go on the trips, and that the trips departed from Pike County.

¶59. Under this statute, "Where an offense is *commenced* in this state and consummated out of it, either directly or by the accused or by any means or agency procured by or proceeding from him, he may be indicted and tried in the county in which such offense was commenced or from which such means or agency proceeded." Miss. Code Ann. § 99-11-17

35

(emphasis added).[9]

¶60.    "[P]roof of venue is an essential part of criminal prosecution, and the State bears the burden of proving venue beyond a reasonable doubt." *Kidder v. State*, 326 So. 3d 1027, 1031 (¶12) (Miss. Ct. App. 2021) (emphasis omitted) (quoting *Hill v. State*, 797 So. 2d 914, 916 (¶10) (Miss. 2001)). The element of "[v]enue may be proved by either direct or circumstantial evidence." *Id*. at 1031 (¶10) (quoting *Hill*, 797 So. 2d at 916 (¶10)). And "questions of fact as to venue are for the determination of the jury and are not to be decided by the trial court." *Id*. (quoting *State v. Fabian*, 263 So. 2d 773, 775 (Miss. 1972)); *see also Hughes v. State*, 735 So. 2d 238, 248 (¶20) (Miss. 1999) ("While the ultimate burden of proving venue that rests upon the State is beyond a reasonable doubt, this is a standard of

---

[9] The question of jurisdiction in exploitation crimes is unique and has been expanded to include the locales where *even just a portion* of the criminal conduct occurred. *See* Miss. Code Ann. § 99-11-17. Two other provisions crafted into our law are worth noting to further convey the breadth of our statutory scheme. Mississippi Code Annotated section 99-11-19 (Rev. 2015) provides:

> When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.

And Mississippi Code Annotated section 99-11-25 (Rev. 2015) reads:

> A person who being out of this state causes, aids, advises or encourages any person to commit a crime or public offense within this state and is afterwards found within this state shall be punished in the same manner as if he had been within this state when he caused, aided, advised or encouraged the commission of such crime or public offense.

36

proof before the jury, not the trial judge").[10]

¶61.    The State had the burden at trial of proving venue in Pike County and had to offer sufficient proof that Alexander committed some portion of the criminal conduct charged in Counts Six, Seven, and Eight while in Pike County. To be clear, the prohibited conduct that must have been proven to have partly occurred in Pike County was that Alexander "*knowingly . . . enticing* a child '*to meet* with the defendant or any other person *for the purpose of* engaging in sexually explicit conduct[.]'" *See Carpenter v. State*, No. 2023-KA-00580-COA, 2023 WL 11898886, at *4 (¶19) (Miss. Ct. App. Aug. 13, 2024) (emphasis added), *motion for reh'g filed* (Aug. 19, 2024).

¶62.    As to Counts Six and Seven, Alexander testified that the St. Louis trip was not a school-sponsored event but instead was a prestigious opportunity for Alexander to showcase one of his songs. Yet Anthony and other Jubilee students made the trip to St. Louis with him and stayed in the same hotel room with him. Anthony even shared a bed with Alexander at the hotel. There is no dispute that Alexander attempted to engage in physical acts with Anthony in the hotel room in St. Louis. But the important consideration here is whether Alexander knowingly induced Anthony to go on the St. Louis trip for the purpose of engaging in sexually explicit conduct. Where the State presented evidence beyond a reasonable doubt that part of Alexander's scheme to exploit Anthony occurred in Pike County, it was proper for the charges in Counts Six and Seven to be heard in Pike County.

---

[10]    Nevertheless, this Court has previously pointed out that "ambiguity as to venue *does not require acquittal* for the crime." *Kidder*, 326 So. 3d at 1032 (¶16) (emphasis added) (quoting *McGowan v. State*, 742 So. 2d 1183, 1185 (¶9) (Miss. Ct. App. 1999)).

¶63. As to Count Eight, the jury heard testimony from Anthony and Jacobs that the excursion to New York was a school-sponsored spring break trip on Jubilee's charter bus. Alexander's testimony corroborated the fact that the New York trip was a school-sponsored event for Jubilee students. There is also no dispute that the physical, sexually explicit conduct Alexander orchestrated between Anthony and Jacobs took place while they were all on the bus driving back from New York. But the important aspect is whether Alexander knowingly induced the Jubilee students to spend their spring break on a school-sponsored trip involving a cross-country bus ride for the purpose of engaging in sexually explicit conduct with the students during the trip. Where the State presented evidence beyond a reasonable doubt that part of Alexander's scheme for the spring break trip occurred in Pike County, it was proper for the charge in Count Eight to be heard in Pike County as well.

¶64. "The questions of whether [Alexander] intended to exploit the child and whether he aimed to meet to engage in sexually explicit conduct with [Anthony and Jacobs] were 'questions of fact to be gleaned by the jury.'" *Westbrook v. State*, 109 So. 3d 609, 613-14 (¶14) (Miss. Ct. App. 2013) (quoting *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974)). Nevertheless, "[w]e realize the State is seldom privy to direct evidence of intent because of the obvious impossibility of peering inside a defendant's mind." *Harris*, 107 So. 3d at 1078 (¶14). As a result, "[i]n assessing [Alexander's] intent, the jury was free to consider his acts, expressions, and declarations." *Westbrook*, 109 So. 3d at 614 (¶14).

¶65. In this case, the jury was specifically instructed that

> a person commits the crime of "Exploitation of a Child" if he, by any means, knowingly entices, induces, persuades, seduces, solicits, advises, coerces or

orders a child, under the age of eighteen (18) years, to meet with any other person for the purpose of engaging in sexually explicit conduct.

The jury was also instructed that

the testimony, regarding the prior criminal activity of the defendant, was offered in an effort to prove *opportunity*, *intent*, *preparation*, *plan*, knowledge, and absence of mistake or accident, on the part of the defendant.

(Emphasis added). "This Court presumes that jurors have followed the instructions of the court, because to presume otherwise would render the judicial system inoperable." *Evans v. State*, 226 So. 3d 1, 26 (¶60) (Miss. 2017). As such, we presume the jurors in this case followed the instructions they were given regarding Alexander's charges.

¶66. The circumstances in this case are akin to the sentiments of this Court's opinion in *Butt v. State*, 986 So. 2d 981 (Miss. Ct. App. 2007). In that case, the defendant was living in Forrest County, Mississippi, where he met a woman and began a romantic relationship with her. *Id*. at 983 (¶3). The couple decided to take a trip to Tennessee to get married. *Id*. It was later discovered the defendant was already married to a woman in Florida. *Id*. at (¶5). Charges were filed against the defendant in Forrest County for violating Mississippi's bigamy statute. *Id*. at 984 (¶6). The defendant claimed Forrest County did not have jurisdiction because the marriage ceremony occurred in Tennessee. *Id*. at (¶7). But this Court found jurisdiction was proper under section 99-11-17. *Id*. at (¶10). We found as follows: "David, while at home in Forrest County, planned to take Margaret out of state to marry her;" and "David and Margaret lived in Forrest County, and it was there that David decided and made plans to marry Margaret." *Id*. at (¶¶11-12). Additionally, "[a]t no point did David plan to remain in Tennessee, and he and Margaret only stayed there for a week after the marriage

ceremony and then returned to their home in Forrest County." *Id*. at (¶12).

¶67.    According to the proof in this record, Alexander made preparations for and planned instances of sexually explicit conduct with his students for years. The jury heard testimony from several past Jubilee students establishing Alexander's repeated behavior and pattern of engaging in sexual and exploitative conduct with at least eight male students in the years leading up to the St. Louis and New York trips at issue.[11] Indeed, when asked who was in charge of planning the respective trips, both Anthony and Melissa Jacobs testified Alexander was responsible. Likewise, both students also testified that it was Alexander who decided who went on any given trip. Alexander took advantage of Jubilee's existence to provide access to these children, using the classrooms and bathrooms to condition children to perform sexually explicit conduct under false pretenses and using similar ruses.

¶68.    It is clear from the record that Alexander was an administrator and instructor at Jubilee in Pike County. Alexander planned the St. Louis trip and New York trip from Pike County. He took students, specifically a student he had a long history of exploiting,[12] from

_____

[11] Kenneth Brown testified he was ordered to participate in sexual activity in different rooms throughout the school while Alexander watched "too many times to count." Knox Cross testified that one time, Alexander drove him to a hotel room "across town" where one of the other students was waiting and then ordered Knox and the other boy to have sex while Alexander sat and watched. Knox also stated that it became an everyday norm for Alexander to order him to engage in sexual activity at the school.

[12] The jury heard testimony from Anthony that Alexander had been forcing him to engage in a variety of sexually explicit conduct with multiple other students, as well as with Alexander himself, in the classrooms and bathrooms at Jubilee for years. Anthony said he began taking guitar lessons at Jubilee in 2012, and over time Alexander "got closer and would spend more time talking to me in private." He also separated the students using his own religious ideology. Anthony testified Alexander told him that he was a "Prophet," and Alexander "was supposed to be the mentor for all the Prophets which gave him more time

40

Jubilee. And importantly, he used his power as an educator at Jubilee and this specific student's future lessons and educational opportunities at the Jubilee school to threaten the child to comply with his demands while at the hotel.

¶69. The dissent focuses on where some verbal requests and some actual sexual acts occurred in reaching its conclusion that Pike County lacked jurisdiction. However, the occurrences of the particular sexual acts included within the language of Counts Six, Seven, and Eight in Alexander's indictment are not the determinative factor for jurisdiction in this case.

¶70. In Counts Six, Seven, and Eight, Alexander was charged with violating Mississippi Code Annotated section 97-5-33(6) (Rev. 2014), the child-exploitation statute. This statute provides: "No person shall, by any means including computer, *knowingly* entice, induce, *persuade*, seduce, solicit, advise, coerce, or order *a child to meet with the defendant* or any other person *for the purpose of* engaging in sexually explicit conduct." *Id*. (emphasis added). As used within the statute, "[t]he meanings of these charging verbs–entice, induce, persuade, seduce, and solicit–draw upon the common theme of tempting, attracting or leading someone astray." *Harris v. State*, 107 So. 3d 1075, 1078-79 (¶15) (Miss. Ct. App. 2013) (internal quotation marks omitted). In other words, "[s]ection 97-5-33(6) does not require that any actual, physical sexual act occur." *Id*. at 1078 (¶13). "Mississippi's statute only applies to

---

and exclusion with us, and [Anthony] in particular." According to Anthony, Alexander convinced him that the only way to avoid being homosexual in the future was to have sex with other boys. He also said Alexander would "arrange for [them] to go into classrooms, and he would close the door and turn off lights and go from looking at the window and looking at us and would be demand that we do various sexual activities[.]"

persons who *knowingly* engage in *the prohibited conduct of enticing a child 'to meet* with the defendant or any other person *for the purpose of* engaging in sexually explicit conduct.'" *Carpenter*, 2023 WL 11898886, at *4 (¶19) (emphasis added) (quoting Miss. Code Ann. § 97-5-33(6)).

¶71. Within the child-exploitation statute, there is a subsection that specifically deals with jurisdiction that states: "For purposes of determining jurisdiction, the offense is committed in this state if all *or part* of the conduct . . . occurs in the State of Mississippi . . . ." Miss. Code Ann. § 97-5-33(9) (emphasis added).

¶72. The sexual acts described—"fondling or other erotic touching of the genitals" and "lascivious exhibition of the genitals"—do not constitute the criminal conduct Alexander is charged with committing. Counts Six, Seven, and Eight in Alexander's indictment *did not* charge him with crimes of *sexual battery or molestation* for the sexual acts that were committed in the hotel room in St. Louis or on the bus ride from New York. Instead, Alexander was charged with the crime of knowingly persuading children to meet—and in this case take field trips—with him for the purpose of later engaging in sexual conduct.[13]

¶73. From his offices and the school building in Pike County, Alexander persuaded these children to go on the field trips. The fact that Alexander knowingly persuaded these children to go on the trips for the purpose of later attempting to engage in sexual conduct with them

---

[13] Unlike many sexual battery charges which focus on the specific moment where the sexual act is committed, exploitation is more akin to a "course of conduct" crime. Our record is replete with evidence that Alexander groomed these children and schemed and planned these trips from his base of operation at the school for the purpose of inducing the presence of the students to later perform sexual acts.

42

while on the trip necessarily puts *part* of this crime within the bounds of the statute.

¶74. This conduct fits squarely within the child-exploitation statutory scheme. The State of Mississippi has an interest in pursuing charges against those who would harm our children on the soil of our State or otherwise. The attack on the two children on the school bus in New York *did not begin on that bus*, and the attack on the child in the St. Louis hotel room *did not begin in that hotel room*. In this case, there was ample proof for a reasonable juror to find that part of Alexander's scheme and conduct in exploiting Anthony and Jacobs arose in Pike County. Therefore, it was proper for Counts Six, Seven, and Eight to be heard in Pike County.

> **V.** **The jury verdicts were not contrary to the overwhelming weight of the evidence.**

¶75. Next, Alexander argues the verdicts were against the overwhelming weight of the evidence presented. Alexander filed a post-trial motion requesting a new trial claiming that "the verdict was against the overwhelming weight of and the lack of evidence presented by the State of Mississippi." In *Craig v. State*, 282 So. 3d 467, 470 (¶¶20-21) (Miss. Ct. App. 2019), this Court explained:

> When we review the denial of a motion for a new trial, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id.* We only review the trial judge's decision to deny a new trial for an abuse of discretion. *Id.* at 292 (¶21).

"It is the role of the jury to evaluate the veracity of witnesses," and it is the "jury's province

43

to determine the credibility of those witnesses and to resolve any conflicts in the evidence." *Montana v. State*, 822 So. 2d 954, 965-66 (¶51) (Miss. 2002).

¶76.    As described above, each victim in Counts Six, Seven, and Eight gave very detailed accounts of how Alexander sexually exploited them. They were each under eighteen years of age, and they each described how they were persuaded by Alexander to meet with another person for the purpose of engaging in sexually explicit conduct in Alexander's presence.

¶77.    Alexander argues on appeal that the allegations contained in his indictment did not occur.  He claims there is no physical evidence to corroborate the victims' testimony,[14] and the fact that the allegations were raised years after they occurred discredited their statements.[15]

¶78.    The jury was properly instructed by the trial court.  The jury heard all the testimony presented at trial, determined the credibility of the witnesses, and resolved any conflicts in the evidence. As a result, the jury unanimously found Alexander guilty of Counts Six, Seven, and Eight of the indictment. We find no error by the trial court in denying Alexander's motion for a new trial.

### VI.    Alexander's sentence was not grossly disproportionate to his crimes.

¶79.    Alexander was sentenced to serve forty years for each of the six counts of child

---

[14] "[T]he absence of physical evidence does not negate a conviction where there is testimonial evidence." *Graham v. State*, 812 So. 2d 1150, 1153 (¶9) (Miss. Ct. App. 2002).

[15] In *Aguilar v. State*, 955 So. 2d 386, 391 (¶15) (Miss. Ct. App. 2006), this Court held that the fact that the minor child failed to immediately report her abuse and "appeared normal to witnesses who saw her after the abuse did not render her testimony legally insufficient."

exploitation, with each term set to run consecutively, for a total of 240 years in MDOC's custody. Alexander argues that he received a grossly disproportionate sentence in violation of the Eighth Amendment. More specifically, Alexander claims that because his sentences for each count were ordered to run consecutively rather than concurrently, he received an "egregiously harsh" sentence.

¶80.    "Any person who violates any provision of [S]ection 97-5-33 shall be guilty of a felony and upon conviction shall be fined not less than Fifty Thousand Dollars ($50,000.00) nor more than Five Hundred Thousand Dollars ($500,000.00) and shall be imprisoned for not less than five (5) years nor more than forty (40) years." Miss. Code Ann. § 97-5-35 (Rev. 2014). In the case at hand, Alexander was found guilty of all six counts of child exploitation under Mississippi Code Annotated section 97-5-33(6). Although he was sentenced to the maximum time on each count, the sentences were clearly within the statutory limits. "When a sentence falls within a range permitted by statute[,] . . . it will not be disturbed on appeal." *Matheny v. State*, 289 So. 3d 328, 335 (¶17) (Miss. Ct. App. 2020) (citing *Willis v. State*, 911 So. 2d 947, 951 (¶16) (Miss. 2005)). "The only exception is if there is proof of gross disproportionality." *Id.*

¶81.    A similar argument was made in *Mosley v. State*, 104 So. 3d 839, 841 (¶8) (Miss. 2012). Mosley claimed that his 126-year sentence constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution. *Id.* He contended that his sentence involved a threshold showing of being grossly disproportionate to the crimes charged and should therefore be evaluated under the proportionality analysis set forth in

*Solem v. Helm*, 463 U.S. 277 (1983). *Mosley*, 104 So. 3d at 841 (¶8). The State maintained that because Mosley's sentence is not "grossly disproportionate," no proportionality analysis was required. *Id*. The Mississippi Supreme Court held that "[a]s Mosley rightly acknowledges, sentencing lies within the sole discretion of the trial court and, generally, will not be disturbed on appeal so long as it does not exceed the maximum term allowed by the statute." *Id*. at (¶10) (internal quotation mark omitted). The supreme court agreed and upheld the judgment of the trial court. *Id*. Because Alexander's sentence falls within the statutory guidelines, there is no inference of its being grossly disproportionate. We find no error by the trial court in sentencing Alexander to serve 240 years in the custody of the MDOC.

## CONCLUSION

¶82. As explained in Parts One and Two, we find Alexander's arguments are unpersuasive or without merit, and we find no reversible error. Therefore, we affirm each of his convictions and sentences.

¶83. **AFFIRMED.**

**PART ONE: BARNES, C.J., WILSON, P.J., WESTBROOKS, LAWRENCE, McCARTY, SMITH AND WEDDLE, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., NOT PARTICIPATING.**

**PART TWO: WESTBROOKS, McDONALD, LAWRENCE, SMITH AND WEDDLE, JJ., CONCUR. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., DISSENTS IN PART TO PART TWO WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J. CARLTON, P.J., NOT PARTICIPATING.**

**EMFINGER, J., DISSENTING IN PART TO PART TWO:**

¶84. While I concur with the remainder of the majority opinion in Part Two, because I

would find that the Pike County Circuit Court did not have jurisdiction over Alexander's conduct charged in Counts Six, Seven, and Eight, I respectfully dissent in part.

¶85. Count Eight of Alexander's indictment alleges that Alexander's criminal conduct occurred between March 13, 2014, and March 23, 2014. Those dates correspond to the dates of the trip to New York. According to Alexander, sixty-two JPAC students went on the trip to New York along with twenty-seven chaperones. The trip was open to any JPAC student who wanted to go. On the trip, the students performed at a school in Harlem and also visited the monuments and other sights in Washington, D.C.

¶86. There is no evidence in the record to show that prior to leaving Pike County on March 13, 2014, Alexander made any effort, as charged in the indictment, to "**advise, persuade and solicit**" Anthony and Jacobs to engage in sexually explicit conduct on that trip. Instead, as described in the majority opinion in Part One, Alexander solicited them to engage in such conduct on the bus on the way back from New York.

¶87. The same is true for Counts Six and Seven. Counts Six and Seven allege that Alexander's criminal conduct occurred between the dates of November 3, 2014, and November 11, 2014.[16] Those dates correspond to the dates of the trip to St. Louis. Alexander testified that the St. Louis trip was not a school trip. According to Alexander, he was being honored for a song that he wrote, and that song was being performed by a choir in St. Louis at the Church of God in Christ convocation. Anthony's testimony was consistent

---

[16] There is evidence in the record that Alexander solicited Anthony on other occasions. Count Five, for which Alexander was convicted, covers a period of more than two and one-half years from January 1, 2012, until October 31, 2014. This period ends just before the trip to St. Louis.

47

with Alexander's in that the purpose of the trip was to attend the Church of God in Christ convocation in St. Louis, Missouri. According to Anthony, Alexander picked him up in a red van on November 3, 2014, and he, Alexander, Elliot Johnson,[17] Jonathan Davidson, and Alexander's son set off on their trip to St. Louis.

¶88.    It was the State's burden to show that Alexander, between those dates listed in Count Six and Seven, did, as charged in the indictment, "**advise, persuade and solicit**" Anthony to engage in sexually explicit conduct with him. The record clearly shows that Alexander's effort to "**advise, persuade and solicit**" Anthony to engage in such conduct happened in the hotel room in St. Louis contemporaneously with Alexander's attempt to engage in such acts.[18] At trial, Anthony testified:

> [Alexander] waited until everyone else was asleep, and then he rolled over and nudged me and told me that I had one last chance to do what he asked of me, or he wouldn't teach me acting anymore.  And he told me that I had to start feeling him on his body, and he started touching my body.  He started kissing my neck and putting his hand up my shirt to try to remove clothes, touch my genitals, and after a couple [of] minutes of allowing him to have his way with me, I pushed away, and I said I didn't care if I couldn't act anymore, I refused.

There is no evidence in the record to show that before leaving Pike County on November 3, 2014, Alexander said anything to Anthony about staying in the same hotel room, sharing a bed, or engaging in sexually explicit conduct in St. Louis.

¶89.    The majority opinion in Part Two attempts to support its decision that Pike County

---

[17] Elliot Johnson was another teacher at JPAC.  At the time of trial, Johnson was deceased.

[18] Although not mentioned in Part Two, Elliot Johnson, Jonathan Davidson, and Alexander's son were also in the same hotel room with Alexander and Anthony.

had jurisdiction in several ways. The majority states:

> Unlike many sexual battery charges which focus on the specific moment where the sexual act is committed, exploitation is more akin to a "course of conduct" crime. Our record is replete with evidence that Alexander groomed these children and schemed and planned these trips from his base of operation at the school for the purpose of inducing the presence of the students to later perform sexual acts.

However, there is no authority cited to support a "course of conduct" theory of jurisdiction that applies to section 99-5-33(6). Further, the opinion suggests that Mississippi Code Annotated sections 99-5-33(9), 99-11-19, and 99-11-25 all support a finding that Pike County had jurisdiction. However, I would find that these statutes are not applicable in this case because Alexander's criminal conduct, as charged in these three counts, did not occur, in whole or in part, in Pike County.

¶90. In *Harris v. State*, 107 So. 3d 1075, 1078 (¶13) (Miss. Ct. App. 2013), a case cited by the majority opinion in Part Two, Harris was in the same house as his girlfriend's fourteen-year-old daughter when he sent text messages to her "expressing his sexual attraction to her and that he wanted to touch her behind." *Id.* at 1076 (¶2). However, there was never any physical contact between the two. In affirming Harris' conviction, this court reasoned:

> Section 97-5-33(6) does not require that any actual, physical sexual act occur. Nor must an actual, confirmed meeting be set or take place. Rather, the mere attempt to exploit a child is enough. As our supreme court recently explained, because "[s]olicitation is sufficient to violate" section 97-5-33(6), the statute is violated and the crime of exploitation is complete when one attempts to exploit a child. *Shaffer v. State*, 72 So. 3d 1070, 1072 (¶¶4-5) (Miss. 2011); *cf. State v. Farrington*, 161 N.H. 440, 20 A.3d 291, 296 (2011) (holding that "[n]owhere in the plain and ordinary meaning" of New Hampshire's similarly worded child-exploitation statute is there "any requirement that the defendant must explicitly or affirmatively ask the victim to engage in sexual [conduct]"). **So the pertinent inquiry is whether Harris, by knowingly communicating**

49

**to the child his desire to engage in sexually explicit conduct with her, was attempting to entice, induce, persuade, seduce, or solicit the child to meet him to engage in that conduct.**

*Id*. at 1078 (¶13) (emphasis added). I agree with the majority in opinion Part Two that an offense pursuant to section 99-5-33(6) is complete upon a defendant's "solicitation" of the child to "meet with the defendant or any other person for the purpose of engaging in sexually explicit conduct," whether or not such conduct actually occurs.

¶91. In *Westbrook v. State*, 109 So. 3d 609 (Miss. Ct. App. 2013), relied upon by the majority in Part Two, the defendant lived in the same apartment complex with the child victim, Smith. *Id*. at 611 (¶4). The two became friends, went to movies and meals together, to movies, and generally spent time together in their apartments. *Id*. Smith testified that Westbrook would rub his hands on Smith's penis and bottom but never inside his pants or underwear. *Id*. When Smith's mother became concerned with this relationship, she sent him to Arkansas to live with his father and instructed the child to have no further contact with Westbrook. *Id*. This court found:

> Evidence was presented to the jury that Westbrook sent Smith a letter indicating his desire to set up a meeting in Jacksonville for them to "maybe go for some pizza and then to [Westbrook's] hotel to visit for a while." A reasonable jury could have concluded that, while an overt request for sexual activity was not made, a request by a middle aged man to "visit" with an underage boy in a hotel room, against his parents' wishes, satisfactorily met the elements of the crime charged.

*Id*. at 613-14(¶14).

¶92. In both *Harris* and *Westbrook*, there were specific contacts, a text message, and a letter, where the defendants "**knowingly communicat[ed] to the child his desire to engage**

50

**in sexually explicit conduct with [the child]"** and was **"attempting to entice, induce, persuade, seduce, or solicit the child to meet him to engage in that conduct."** (Emphasis added). In the present case in Count Eight, that communication occurred on the bus on the way back from New York. In Counts Six and Seven, that communication occurred in the hotel room in St. Louis.

¶93. Accordingly, the Pike County Circuit Court lacked jurisdiction to proceed on those three counts of Alexander's indictment. Because I would find that the jury verdicts as to Counts Six, Seven, and Eight of Alexander's indictment should be reversed and rendered, I respectfully concur in part and dissent in part as to the majority opinion in Part Two.

**BARNES, C.J., JOINS THIS OPINION.**